UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Leonard C. Wright, Sr.,

       Plaintiff,

       v.                         Civil Action No. 2:14-cv-90-wks-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

       Defendant.


## REPORT AND RECOMMENDATION
(Docs. 7, 13)


       Plaintiff Leonard Wright brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act (SSA), requesting review and remand of the decision of the

Commissioner of Social Security denying his applications for disability insurance

benefits (DIB) and supplemental security income (SSI).  Pending before the Court are

Wright's motion to reverse the Commissioner's decision (Doc. 7), and the

Commissioner's motion to affirm the same (Doc. 13).  For the reasons stated below, I

recommend that Wright's motion be granted, and the Commissioner's motion be denied.

I further recommend that the ALJ's decision be reversed and the action remanded solely

for calculation of benefits.

**<u>Background</u>**

Wright was 38 years old on his alleged disability onset date of June 1, 2005.  He completed nine years of schooling, receiving special education assistance, and does not have a GED.  Wright has a marginal work history, working in various short-term unskilled jobs, including as a laborer, a roofer, a linen sorter, and a fast-food worker.  Due to low earnings levels, none of these jobs qualify as past relevant work under the SSA.

Wright was born and raised in Massachusetts.  (AR 1401.)  He was a poor student, having to repeat at least two grades.  (AR 27–28, 991, 1419.)  He left school when he was 15 after his father died and his family needed him to work.  His mother died when he was 17.  After his parents' death and in his early 20s, Wright had no permanent residence and lived temporarily either on his own or with various friends and relatives, until he was 27, when he had his first son.  (AR 1419.)  Wright has never been married.  He moved to Vermont in 1991, and met the mother of his first daughter in 1992.  He has not seen this child since she was eight months old when her mother left with her.  In 1993, he met the mother of his next four children, and was in a relationship with her until 2001, when she left him and the children for another relationship.  Wright subsequently obtained full custody of these four children, and their mother is not in their lives.  In 2010, Wright met the mother of his sixth child, a woman who had three additional children from a prior relationship.  Thus, as of February 2012, Wright had six children: a girl born in 1992 who he had not seen since she was an infant; three girls and one boy ages 11, 12, 14, and 17 who he had cared for on his own since 2001; and a four-month-old boy.  (AR 1402–03.)

He was living in a five-bedroom duplex apartment in Brandon, Vermont, with his four older children, his infant son, his girlfriend, and his girlfriend's three other children. (AR 1402.) At that time, all four of the children Wright raised on his own were on Individual Education Plans (IEP) in school, and two of them were receiving social security benefits as a result of their learning disabilities.

In January 2010, Wright testified that, on a typical day, he got his children off to school and then was in and out of the bathroom for the rest of the morning, dealing with stomach problems. (AR 30, 34.) He stated that he attended medical, educational, and other appointments for himself and his children in the afternoon, and in the evening he cared for his children, including preparing their meals and trying to help them with their homework. (*Id.*; *see also* AR 194–97, 215–18, 222.) When he did not have appointments, he was at home by himself all day, watching television and doing household chores including cleaning, doing the laundry, and going food shopping. (*Id.*; AR 39–41, 50, 822.) When his daughters were home, they helped with the chores. (AR 39–41.) In June 2012, Wright testified that his daily routine was mostly the same as in 2010, except that his daughters were helping more with the chores and cooking. (AR 956–58, 963.) Wright does not have a driver's license, as he received many driving citations when he was a teenager, losing his license as a result. He has been arrested five or six times, several times for driving with a suspended license and several times for possession of marijuana. He uses marijuana on occasion, primarily to manage pain, relieve stress, and increase his appetite. (AR 1007–08, 1419.)

Wright suffers from a combination of physical and mental impairments. His most significant physical problem is his gastrointestinal disorder. He began having stomach problems around the age of 15. He was diagnosed with gastro-esophageal reflux (GERD), which was ultimately treated in April 2005 with a surgical procedure called Nissen fundoplication. (AR 422–35, 954.) Subsequent to the surgery, Wright continued to experience severe abdominal symptoms, including abdominal pain, gas buildup, and an inability to vomit or burp, resulting in over ten emergency room visits and at least one hospitalization from 2005 through 2009 and another ten emergency room visits in 2012. (AR 279–84, 289–90, 659–704, 737–54, 871–73, 1453–72, 1482–1501, 1522–47, 1739–62.) When he has severe abdominal pressure, Wright self-treats at home with a naso-gastro (NG) tube to relieve distention. (AR 32–33, 289–90, 955–56.) In January 2010, Wright testified that he used the tube "[p]robably four times" in the prior three months but there was not an "average" frequency in his use of it. (AR 33.) In June 2012, Wright testified that he used the NG tube "a couple times a month anyway." (AR 955.) In December 2012, Wright underwent a partial takedown of the previous Nissen fundoplication. (AR 1876–80.) In September 2013, Wright testified that, although the takedown surgery provided some relief, he still had air in his stomach upon waking every morning and thus still used the NG tube, although less frequently than he had before the surgery. (AR 994–95.)

In addition to his stomach problems, Wright suffers from other ailments, physical and mental. In December 2009, Wright's primary care physician, William Barrett, MD, listed the following additional diagnoses: traumatic brain injury (TBI) due to closed head

4

injuries arising from two automobile accidents he was involved in as a teenager; chronic headaches; problems concentrating, attending to duties, and maintaining employment; shoulder pain with a history of torn rotator cuff; neck pain with a history of cervical spine fracture; and low back pain with a herniated disc. (AR 886–87.) Dr. Barrett also diagnosed Wright with chronic depression and anxiety. (AR 886.) In January 2010, Wright testified that he could not be around a lot of people because he felt like he was suffocating, and he was "pretty much a lone person." (AR 50.) In January 2010 and September 2013, Wright testified that he constantly worried about everything; he lost track of things; he was easily distracted; and he had problems managing his anger. (AR 44, 46–47, 1004–07.)

On November 30, 2006, Wright filed applications for DIB and SSI. Therein, he alleged that, starting on June 1, 1993,[1] he has been unable to work due to "Cognitive Impairment, Severe Esophagitis, Neck and back injury, Knee injury, Possible TBI from head trauma . . .[, and] pain from past orthopeadic [sic] and neurological injuries." (AR 159.) He explained that there were days when "it [wa]s difficult to get out of bed and walk due to severe pain and limited mobility." (*Id.*) He further explained that he had difficulty concentrating and remembering things, learning new things, and setting priorities in caring for himself and his children. (*Id.*) Wright's applications were denied initially and upon reconsideration, and he timely requested an administrative hearing. The first administrative hearing was conducted on January 27, 2010 by Administrative

---

[1] Before the first administrative hearing, Wright amended his alleged disability onset date to June 1, 2005. (AR 81.)

Law Judge (ALJ) Thomas Merrill. (AR 24–56.) Wright appeared and testified, and was represented by counsel. A vocational expert (VE) also testified at the hearing. On February 26, 2010, the ALJ issued an unfavorable decision, finding that Wright's only severe impairment was gastrointestinal disorders and that Wright was capable of a limited range of medium work and thus could return to his past relevant work as a laundry worker. (AR 4–18.) The Decision Review Board failed to complete its review of ALJ Merrill's decision within 90 days, making the decision the final decision of the Commissioner. (AR 1–3.) Wright subsequently filed a claim in this Court, and on September 28, 2010, the Court ordered the case remanded for further administrative proceedings pursuant to the parties' stipulated motion to remand. (AR 1025–27.) On April 28, 2011, the Disability Review Board issued a remand order based on the Court's September 2010 order. (AR 1028–32.)

A second hearing was held before ALJ Merrill on June 1, 2012.[2] (AR 949–84.) Wright again appeared and testified, and was represented by counsel. Although medical experts in psychology and orthopedics were scheduled to testify at the hearing, the ALJ decided that the main issue was vocational and thus a VE was the only expert to testify.[3] (AR 952–53.) On August 24, 2012, ALJ Merrill issued a second unfavorable decision on Wright's applications, making substantially the same findings as the first decision other

_____

[2] Prior to this hearing, and after the initial January 2010 hearing, Wright underwent two psychological evaluations which were accompanied by additional medical opinions regarding his psychological limitations. (AR 1394–1426.)

[3] This second administrative hearing was initially scheduled for February 2012, but was continued on that date because one of the medical experts was ill. (AR 900, 1098–1131.) The hearing was rescheduled for approximately four months later, in June 2012, with different medical experts. (AR 1155–75.) As stated, however, no medical experts appeared at the June 2012 hearing. (AR 949–84.)

than a new finding that Wright had no past relevant work but was capable of performing other work.  (AR 1043–56.)  Wright filed exceptions to the decision, and in April 2013, the Appeals Council issued a second order remanding the case, this time with instructions to assign a new ALJ.  (AR 1035–38.)

The case was reassigned to ALJ Matthew Levin, and on September 12, 2013, a third administrative hearing was held.  (AR 985–1024.)  Testimony from a VE and Wright's mental health counselor, Ken Smith, MA, LCMHC, LADC, was taken at the hearing.  Approximately two weeks later, ALJ Levin issued the third unfavorable decision, finding that Wright was not disabled under the SSA from his alleged disability onset date of June 1, 2005 through the date of the decision.  (AR 921–38.)  It is this decision, described in detail below, which is under review here.  Wright filed exceptions to ALJ Levin's decision, but on March 27, 2014, the Appeals Council denied Wright's request for review, rendering it the final decision of the Commissioner.  (AR 893–95.)  Having exhausted his administrative remedies, Wright filed the Complaint in this action on May 5, 2014.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Levin first determined that Wright had not engaged in substantial gainful activity since his alleged onset date of June 1, 2005. (AR 924.) At step two, the ALJ found that Wright had the following severe impairments: "gastrointestinal disorders, status post Nissen [f]undoplication surgeries, degenerative

8

disc disease of the cervical and lumbar spines, a right rotator cuff tear, depression, anxiety, a personality disorder, a cognitive disorder/learning disorder[,] and polysubstance abuse." (*Id.*) Conversely, the ALJ found that the following impairments were non-severe, as they did not cause functional limitations over a 12-month period: "documented left scapula fracture, knee pain, right hand fifth digit fracture, and left femur fracture with rod placement." (*Id.*) At step three, the ALJ found that none of Wright's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 924–26.)

Next, the ALJ determined that Wright had the RFC to perform "light" work, as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Wright] would need to be allowed a sit/stand option; he could frequently but not constantly engage in overhead reaching with the right upper extremity; he is limited to simple, unskilled work in a low-stress environment, defined as requiring little to no change in the work setting and little to no need for the use of judgment; he is able to maintain attention and concentration for two-hour increments throughout an eight-hour workday; he could sustain brief and routine social interaction with co[]workers and supervisors; and due to his gastrointestinal exacerbations, he would be absent from work approximately one day per month.

(AR 926.) Based on a review of Wright's earnings record, the ALJ found that he had no past relevant work. (AR 937.) Thus, the ALJ proceeded to the fifth step of the sequential analysis, and found that there are jobs existing in significant numbers in the national economy that Wright could perform, including the jobs of price marker, mail clerk, and flagger. (*Id.*) The ALJ concluded that Wright had not been under a disability from the alleged onset date of June 1, 2005 through the date of the decision. (AR 938.)

## Standard of Review

The SSA defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the SSA is "a remedial statute to be broadly construed and liberally applied."  *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

### Analysis

Wright contends that the ALJ failed to properly evaluate the opinion evidence, failed to properly discuss and evaluate Wright's credibility, and failed to properly evaluate Wright's mental impairments, resulting in a mental RFC determination that conflicts with the opinions of all examining psychologists and Wright's treating mental health counselor.  Wright further contends that the ALJ's decision is not supported by substantial evidence.  Considering that his claim was filed over eight years ago and arguing that no purpose would be served by remanding for further proceedings, Wright seeks a remand solely for calculation of benefits rather than for further proceedings and a new decision.  In response, the Commissioner moves for a judgment affirming the ALJ's decision, claiming that it is supported by substantial evidence and complies with the applicable legal standards.

I.      **The ALJ erred in his analysis of the medical opinions.**

Wright argues that the ALJ erred in giving "great weight" to the August 2007 opinions of nonexamining agency consultant William Farrell, PhD, and lesser weight to the August 2007 and more recent opinions of treating mental health counselor Ken Smith, MA, LCMHC, LADC, and examining psychologists Dean Mooney, PhD; Rayna Ericson, PhD; Robert Roth, PhD; and Craig Knapp, PhD.  The Commissioner disagrees, and asserts that substantial evidence supports the ALJ's analysis of the medical opinions.

In August 2007, after reviewing the record, Dr. Farrell opined that Wright's mental impairments caused mild limitation in daily activities and social functioning; moderate limitation in concentration, persistence, or pace; and no episodes of decompensation. (AR 840.) Dr. Farrell further opined that Wright had no significant limitation in understanding and memory; and had sufficient concentration, persistence, and pace to sustain for two-hour blocks of time in three-step, low-stress work activities throughout the workday and workweek. (AR 826–28.) The ALJ gave these opinions "great weight," finding them to be "generally consistent" with "the more recent neuropsychological findings [of examining consultants Drs. Ericson, Roth, and Knapp]." (AR 934.)

In a report from the same month as Dr. Farrell's (August 2007), consultant Dr. Mooney opined—after examining Wright—that the prognosis for Wright's mental health condition was "guarded," and that Wright had "serious chronic health problems," including esophagitis, history of head trauma, and back and joint pain, which prevented him from maintaining employment. (AR 825.) Dr. Mooney noted that Wright became distracted on several occasions during the examination, failed to accurately repeat a sentence, and had difficulty following a three-step command, being able to remember only the first step. (AR 820, 824.) Dr. Mooney diagnosed Wright with adjustment disorder with mixed anxiety and depressed mood, and assigned him a GAF score of 50, which indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school

functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, at 32 (4th ed. 2000). Dr. Mooney concluded as follows: Wright's "mental condition appears to be a consequence of his medical condition and it is unclear whether this is treatable"; without successful treatment, "it is unlikely that [Wright] will be able to return to work." (AR 825.) The ALJ afforded "less weight" to Dr. Mooney's opinions on the grounds that they "appear[] to be primarily based upon [Wright's] self-reports and conclusion[s] about ability to work rather than [Dr. Mooney's] own objective findings or observations." (AR 935.)

Over four years later, in December 2011, Drs. Ericson and Roth performed a neuropsychological assessment of Wright, and reported results more consistent with Dr. Mooney's opinions than Dr. Farrell's. Specifically, Drs. Ericson and Roth found that, overall, Wright demonstrated impairments in processing speed which likely impacted his performance on other timed tests and may have impacted his performance when learning new information. (AR 1398.) They further found that the nature of Wright's cognitive problems "is consistent with his history of multiple head injuries, though fatigue, chronic pain, and affective distress may be exacerbating the problems that he has noticed in his daily life." (AR 1399.) Drs. Ericson and Roth stated that their examination results were "generally consistent with [Wright's] reported problems with aspects of attention, memory, and executive functions in everyday life, as well as his report of becoming easily overwhelmed in situations which require him to attend to multiple sets of information at once." (*Id.*)

A few months later, in February 2012, Dr. Knapp performed an intensive evaluation of Wright, based on testing and clinical examinations conducted in four one-hour sessions. (AR 1401–26.) Dr. Knapp also reviewed the medical and psychological records, including Dr. Mooney's evaluation, Dr. Farrell's assessment, the evaluation of Drs. Ericson and Roth, and treatment notes and reports from Dr. Barrett, Wright's primary care physician, and Ken Smith, Wright's treating mental health counselor. (AR 1407–12.) In his 22-page evaluation, Dr. Knapp concluded that Wright was functioning with "borderline intellectual ability," experiencing "significant difficulty" recalling information heard in context and "significant deficits" in visual processing speed, visual working memory, and memory for recalling and reproducing visual patterns. (AR 1419.) Dr. Knapp diagnosed Wright with dysthymic disorder, anxiety disorder NOS (not otherwise specified), cognitive disorder NOS (with delays in memory and visual processing speed), cannabis abuse (rule out dependence), and personality disorder NOS (with schizoid and avoidant features); and assigned Wright a GAF score of 47, which indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)," *DSM-IV*, at 32. (AR 1420–21.) Dr. Knapp opined that, although Wright could understand, remember, and carry out simple instructions in a work setting, he would most likely have "significant difficulty" responding to complex instructions due to difficulties with short-term and delayed memory, depending on the nature of the instruction, and would have "extreme difficulty" completing complex tasks on a sustained basis. (AR 1421.) Dr. Knapp continued:

[Wright's] ability to respond to coworkers and supervisors would likely be significantly compromised due to the nature and extent of his depression and anxiety, as well as characterological features, as evidenced by recurrent disruptive relationships in work settings in the past. His ability to respond to work pressures in a work setting on a sustained basis would also be most likely significantly compromised due to the nature of his medical concerns, as well as his emotional and characterological difficulties noted above.

(*Id.*) Dr. Knapp noted that, although Wright's marijuana use would exacerbate his limitations in an employment setting, even if that were not a factor:

[I]t is anticipated that the combination of [Wright's] medical difficulties, memory[-]related issues, delayed processing speed for visually based information[,] and difficulties utilizing visual information that he has learned in subsequent novel situations, coupled with his emotional difficulties and characterological features (avoidant and schizoid tendencies) would nonetheless still produce significant impairments in his ability to relate adequately to others in an employment setting and to sustain a rate of productive work performance throughout an eight[-]hour day or 40[-]hour week.

(AR 1421–22.)

Dr. Knapp's evaluation constitutes the most comprehensive consultant report in the record. The evaluation (including the opinions contained therein) is well supported by objective testing and the medical record generally, and no treating provider opinions or reports are substantially inconsistent with it. Nonetheless, lumping Dr. Knapp's opinions in with those of Drs. Ericson and Roth, the ALJ gave them "only some weight," explaining that they are "unsupported by either [Dr. Knapp's] objective observations of [Wright] or [Wright's] functioning in other treatment" and "inconsistent with the other evidence of record," principally Wright's ability to "manag[e] the needs of himself and his family, including work[ing] with [his] children as part of their special needs program." (AR 934.) The ALJ's analysis of the opinions of Drs. Knapp, Ericson, and

Roth contains no citation to the record, a significant omission considering how extensive Dr. Knapp's evaluation is. (AR 933–34.)

The regulations provide that, in general, "more weight" is given to the opinion of a medical source who has examined the claimant than to the opinion of a source who has not. 20 C.F.R. § 404.1527(c)(1); *see Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986) ("opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians"). Additionally, while the findings of nonexamining analysts can, and often do, provide valuable supplemental support for an ALJ's decision, they should generally be afforded relatively little weight in the overall disability determination. *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal quotation marks omitted). Here, although Dr. Mooney, Dr. Ericson, Dr. Roth, and Dr. Knapp did not have ongoing treatment relationships with Wright, they each at least examined him on one or more occasion, as compared to Dr. Farrell, who merely reviewed the records in existence at the time of his report and formulated opinions based thereon. The ALJ should have given less relative weight to the opinions of Dr. Farrell based on this significant fact. *See Rodriguez v. Astrue*, No. 07 Civ. 534(WHP)(MHD), 2009 WL 637154, at *25 (S.D.N.Y. Mar. 9, 2009) ("a doctor who has direct contact with a claimant—even as an examining doctor—is likely to have a better grasp of her condition than someone who has never seen the claimant"); *Velazquez v. Barnhart*, 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007) ("[a] psychiatric opinion based on

a face-to-face interview with the patient is more reliable than an opinion based on a review of a cold, medical record"). The ALJ also should have given less weight to Dr. Farrell's opinions because they were made in 2007, years before the significant reports and opinions of Drs. Knapp, Ericson, and Roth were added to the record. *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (medical consultant's assessment deemed incomplete where it was unclear whether he reviewed all of the evidence).

More importantly, the ALJ's finding that Dr. Knapp's opinions are entitled to less weight because they are based principally on Wright's "subjective complaints," is unfounded. (AR 934.) First, it was proper for Dr. Knapp to consider and incorporate Wright's subjective complaints into his evaluation. A consulting examiner is not required to disregard the claimant's subjective complaints, especially in the context of mental impairments; rather, he is required to take these complaints into account in making diagnoses and opinions regarding the claimant's functionality. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that [the doctor] . . . relied on [the claimant's] subjective complaints hardly undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool.") (internal quotation marks and brackets omitted); *Westphal v. Eastman Kodak Co.*, No. 05-CV-6120, 2006 WL 1720380, at *5 (W.D.N.Y. June 21, 2006) ("in the context of a psychiatric evaluation, an opinion based on personal examination is inherently more reliable than an opinion based on a cold record because observation of the patient is critical to understanding the subjective nature of the patient's disease and in making a reasoned diagnosis").

Second, as noted above, Dr. Knapp's opinions were made based on the results of a lengthy and detailed clinical evaluation which included psychological testing and a review of past testing conducted by other evaluators. The ALJ appears to have taken these test results and improperly formulated his own opinions regarding Wright's functionality.[4] But "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). The Second Circuit has explained: "[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Id.* (alterations in original) (internal quotation marks omitted); *see also Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) (finding that ALJ improperly substituted his own judgments for those of a physician, by reevaluating medical tests without citing any supporting expert testimony and reaching conclusions different from those of the physician, and holding: "[i]n the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings"). Here, there are no treating or examining physician opinions inconsistent with Dr. Knapp's, and thus the ALJ did not choose from among properly submitted medical opinions but rather, made his own, unsupported medical conclusions.

---

[4] The ALJ also appears to have substituted his own judgment for that of Dr. Mooney, stating that "Dr. Mooney's cited objective findings are insufficient to support his conclusion." (AR 935.) In making this statement, the ALJ presumably was relying on the finding in Dr. Mooney's report that Wright scored a 27 on the Folstein Mental Status Examination "indicating no cognitive impairment." (AR 824.) But the ALJ neglected to mention that the report also states that Wright failed to accurately repeat a sentence and had difficulty following a three-step command, becoming distracted during the instructions and being unable to remember the second and third instructions. (*Id.*)

Dr. Knapp's opinions are also mostly consistent with those of Ken Smith, MA, LCMHC, LADC, Wright's treating mental health counselor since early 2009.[5] (AR 935, 1013–14.) Over the years, Smith consistently opined that Wright had marked and extreme limitations, particularly in the areas of social functioning and concentration, persistence, or pace. (*See, e.g.*, AR 859–61, 890–92, 1014–19, 1864–71.) For example, in June 2009, Smith stated that Wright "suffers from anxiety and depression which is quite disabling for him at times. He also has a number of physical disabilities that have a direct impact on his emotional stability [and] [i]t is not possible to separate the physical vs. emotional impact of various conditions or disorders." (AR 859.) Smith continued:

> It is quite clear to me that symptoms of depression and anxiety would seriously compromise [Wright's] ability to perform work[-]related activities and to reason and remember on the job. Also his ability to relate to others on the job could be a challenge. [Wright] would actually prefer to be working if he could but the combination of physical and emotional disorders make this clearly not an option.

(*Id.*) Smith further stated that Wright "struggles with anxiety and depression which compromise his functional ability in many ways. His coping skills have been inadequate and part of his treatment has been developing new coping skills." (AR 861.) In July 2013, Smith stated that, because of his depressive and anxiety symptoms, memory problems, and personality issues, "[Wright] would be 'off task' at least 50% of the time or more." (AR 1867.) At the September 2013 administrative hearing, Smith stated that Wright had difficulty taking in and comprehending information and conversations (AR

---

[5] At the administrative hearing, Smith explained his credentials: he has a master's degree in counseling psychology and is licensed by the State of Vermont as both a clinical mental health counselor and a drug and alcohol counselor. (AR 1013.)

1015), was easily distracted (1015, 1017), and would have a "real difficult time sustaining . . . focus and concentration at any kind of full-time employment" (AR 1018).

As a mental health counselor with a masters in psychology, Smith was not an "acceptable medical source," and thus his opinions are not entitled to the same weight as those of a treating physician. 20 C.F.R. §§ 404.1513(a), 416.913(a). Nonetheless, the ALJ was required to provide a reasonable explanation for his decision to afford limited weight to Smith's opinions. *See, e.g.*, *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010). Social Security Ruling (SSR) 06-03p states that, in addition to evidence from "acceptable medical sources," ALJs may use evidence from "other sources" to show the severity of the claimant's impairments and how they affect the claimant's ability to function. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). These "other sources" include medical sources who are not "acceptable medical sources," such as licensed clinical social workers and therapists, and "non-medical sources" such as social welfare agency personnel. *Id.* SSR 06-03p explains that medical sources like licensed clinical social workers and therapists, who are not technically deemed "acceptable medical sources" under the regulations, "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* at *3. Thus, opinions from these medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.*

SSR 06-03p directs ALJs to apply the following factors in evaluating opinion evidence from "other sources" such as Smith: (1) how long has the source known and

how frequently has she seen the claimant; (2) how consistent is the source's opinion with other evidence; (3) does the source present relevant evidence to support her opinion; (4) how well does the source explain her opinion; (5) is the source a specialist or expert in the area related to the claimant's impairment; and (6) any other factors tending to support or refute the opinion. *Id.* at *4–5. The Ruling allows for both "other medical source" and "other non-medical source" opinions to outweigh the opinions of "acceptable medical sources":

> [D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, *it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.*

*Id.* at *5 (emphasis added).

Here, the ALJ gave several reasons for affording little weight to Smith's opinions, including that Smith is not an acceptable medical source; his opinions are inconsistent with other medical opinions and with Wright's daily activities; and his opinions are unsupported by treatment notes. (AR 935–36.) None of these reasons suffice as a good reason to give little weight to Smith's opinions and great weight to the opinions of the nonexamining agency consultant. Smith has been treating Wright since 2009 for a total of 49 sessions. (AR 936, 1013, 1865.) He provided detailed explanations for Wright's mental limitations, both in written statements and in testimony at the administrative hearing. (AR 859–61, 890–92, 1013–19, 1864–71.) Contrary to the ALJ's finding,

Smith's opinions are in fact substantially consistent with those of the other examining consultants, including Dr. Knapp and Dr. Mooney. The only material difference between the opinions of Dr. Knapp and Smith is that Smith opined in July 2013 that Wright was "marked[ly]" limited in his ability to understand, remember, and carry out even short, simple instructions (AR 1870), and Dr. Knapp opined in February 2012 that Wright was only "slight[ly]" limited in his ability to understand and remember, and "moderate[ly]" limited in his ability to carry out, short, simple instructions (AR 1425). Much more significant, however, both Dr. Knapp and Smith opined that Wright was "marked[ly]" limited in his ability to understand and remember, and "extreme[ly]" limited in his ability to carry out, detailed instructions. (AR 1425, 1870.) And overall, Dr. Knapp's evaluation is mostly consistent with Smith's opinions, particularly in the areas of social functioning and concentration, persistence, or pace. (*Compare* AR 1425–26 *with* AR 1870–71.) Smith's opinions are also consistent with the findings in Dr. Mooney's report, particularly regarding Wright's distractibility and low GAF score. (AR 817–25.)

The ALJ found that Smith's opinions are inconsistent with Wright's daily activities, including his "ability to live independently and fully care for [his] children." (AR 936.) As discussed in more detail below, however, testimony from Smith and Wright himself indicates that Wright has struggled to live independently and raise his children, requiring significant assistance with the children, all of who have required special education services in school. (*See* AR 30, 536–38, 641, 670, 674–78, 681, 685, 730, 859, 890, 968, 1016.)

Finally, the ALJ gave little weight to Smith's opinions because "the record does not contain documentation of [Smith's] reported 49 treatment sessions with [Wright]." (AR 936.)  An opinion's supportability is indeed a proper factor to consider in assessing its value, *see* 20 C.F.R. § 404.1527(c)(3); but substantial evidence does not support the ALJ's finding that Smith's opinions are unsupported.  As noted above, Smith provided narratives in June 2009 and January 2010 and a Medical Source Statement in July 2013, wherein he described his treatment sessions with Wright and explained the reasoning behind his opinions.  (AR 859, 890, 1864–71.)  Smith further described his treatment of and opinions about Wright at the September 2013 administrative hearing,[6] and testified that he believed his opinions were consistent with the test results reported by Drs. Knapp, Ericson, and Roth.  (AR 1013–19.)

Because the opinions of the treating counselor (Smith) and examining psychologists (Drs. Knapp, Mooney, Ericson, and Roth) are consistent with each other, grounded in personal interaction with Wright, and not inconsistent with the opinions of any other treating or examining provider; the ALJ presumptively should have given them great weight.  The findings of Dr. Farrell, on the other hand, should have been viewed with skepticism and given less weight because they are largely inconsistent with the findings of all the treating and examining sources; they do not account for the "subjective nature" of Wright's mental illness, *Giles v. Astrue*, No. 06-CV-702, 2008 WL 4852947, at *4 (W.D.N.Y. Nov. 6, 2008); and they were made years before other significant

---

[6] Specifically, Smith explained that Wright had difficulty remembering things they talked about in their sessions and practicing new strategies between sessions (AR 1014), displayed "racing thoughts," and had a hard time "calm[ing] his thinking process down long enough to take in new information" (AR 1015).

opinion and objective medical evidence was added to the record. The ALJ's improper analysis of the medical opinions is not harmless error because the VEs at the administrative hearings testified that the need for occasional redirection throughout an eight-hour workday and the ability to complete only one-step tasks—which limitations the examining and treating providers opined Wright experienced—would preclude work. (AR 54, 974–76, 1022–23.)

## II.     The ALJ erred in his assessment of Wright's credibility.

The ALJ also erred in his assessment of Wright's credibility. It is the province of the Commissioner and not the reviewing court to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Thus, if the Commissioner's credibility findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1980)). "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). These reasons "must be grounded in the evidence and articulated in the determination or decision." *Id.*

Here, the ALJ did not discuss Wright's testimony at any of the three administrative hearings, except to comment on Wright's ability to raise four children. (AR 921–38.) Moreover, while the ALJ gave specific reasons in support of his assessment of Wright's credibility, these reasons are not supported by substantial

evidence.  The ALJ was particularly focused on Wright's ability to care for his children, stating as follows:

> To [Wright's] credibility as a general matter, I note most persuasively that the record makes multiple references to the fact that despite his allegedly disabling physical and mental conditions that supposedly render him unable to perform even simple daily tasks, [he] has been fully able to care [for] four children by himself since 2001, a task that requires significant physical and mental abilities.

(AR 931.)  As noted above, however, the record demonstrates that raising his children has been a significant challenge for Wright, and he has required assistance with this task. (*See, e.g.*, AR 30, 536–38, 641, 670, 674–78, 681, 685, 730, 859, 890, 968, 1016.)  For example, a July 2004 note from the Visiting Nurse Association of Rutland County (VNA) states: "[Wright] has had difficulty getting [his] girls to school [and] is in danger of losing subsidy.  I have spoken to Andy Hughes at VAC."  (AR 677.)  And an August 2004 VNA note states: "[Wright] [d]id not take kids to school.  Is having difficulty organizing himself to get going in [the morning].  Needs a parenting class, but currently not willing."  (AR 678.)  A September 2004 VNA note states: "[Wright] continues to need much support in setting limits for [his] kids and making school decisions."  (AR 681.)  In July 2006, a vocational rehabilitation counselor at VocRehab Vermont wrote: "At one time we all met at the Head Start School and it seemed quite obvious from the conversation, and my experience with [Wright], that he does indeed face barriers around his cognitive abilities and that raising the children maximizes his functional capacities, and thus employment on top of child rearing would simply be too overwhelming."  (AR 730.)

Although it was certainly proper for the ALJ to consider Wright's daily activities in assessing his credibility, including Wright's ability to do housework and care for his children, *see* 20 C.F.R. § 404.1529(a), (c)(3), the ALJ should have looked deeper into Wright's actual performance of these duties. Wright was indeed responsible for the care of his four or more children during the relevant period. But the evidence demonstrates that he had significant problems doing so. As discussed above, in 2004, he required substantial parenting assistance from the VNA, and he was described as having very poor coping skills and poor judgment. (*See, e.g.*, AR 639–40, 685.) The record as a whole indicates that Wright did little more than the bare minimum daily activities with his children: getting them up in the morning and off to school, preparing their meals, putting them to bed in the evening, and taking them to scheduled medical and school appointments. (AR 30, 194–96, 215–17, 222.) The record also indicates that his children were not at home for the majority of the weekdays: in 2010, Wright testified that, on most days, three of his four children were out of the house from early in the morning when they went to school until 6:00 in the evening when they returned from their afterschool programs. (AR 43–44.) He further testified that, while he would like to engage in sports and other activities with his children, the only activity he did with them was fishing, which entailed very little activity. (AR 44–46.)

The Second Circuit has long held that a claimant need not be an invalid, incapable of performing any daily activities, in order to receive disability benefits. *See Balsamo*, 142 F.3d at 81; *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989) ("When a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a

shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working.").  Wright testified that, most days, he "just stay[s] at home" by himself not doing much of anything, and the record as a whole supports this testimony, despite the ALJ's depiction of an active, involved father.  (AR 44; *see also* AR 30, 199, 219–20, 969.)  As far as housework, again, it appears that Wright did little more than the bare minimum.  And he testified that his children help him, doing chores like washing the dishes, helping cook meals, mopping the floors, and cleaning their own bedrooms.  (AR 39–41, 963.)

Another reason provided by the ALJ in support of his assessment of Wright's credibility is that Wright had not engaged in consistent mental health treatment or been managed on mental health medications.  (AR 930.)  But SSR 96-7P provides that ALJs "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment *without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment*."  1996 WL 374186, at *7 (1996) (emphasis added); *see also McFadden v. Barnhart*, No. 94 Civ. 8734(RPP), 2003 WL 1483444, at *8 (S.D.N.Y. Mar. 21, 2003) ("[A] claimant may only be denied disability benefits if the [Commissioner] finds that she *unjustifiably* failed to follow prescribed treatment and that if she had followed the treatment, she would not be disabled under the Act.") (citing 20 C.F.R. § 404.1530; SSR 82-59, 1982 WL 31384, at *4 (1982)) (emphasis added).  Wright testified that one of the reasons he had not taken medication was because he has had

negative side effects from medications and thus reasonably fears additional side effects, particularly due to his stomach problems.  (AR 1002, 1008–10.)  Regarding mental health treatment, Wright did attend counseling with Ken Smith, but Smith testified that the efficacy of that treatment was questionable, given Wright's cognitive issues, including difficulty comprehending and remembering things they talked about and practicing new strategies between sessions.  (AR 1014–15.)  Smith stated: "[I]t's difficult to introduce any kind of new information or change goals because of the cognitive issues."  (AR 1015–16.)  Consistent with this opinion, in August 2007, Dr. Mooney stated in his report that Wright was "no longer receiv[ing] mental health services" because he did not believe he was benefitting from them.  (AR 823.)

## III.     The appropriate remedy is to remand for calculation of benefits.

The final question is whether Wright's claim should be remanded for further proceedings and a new decision, or solely for calculation of benefits.  Although the former approach is usually preferred, in this case, I recommend remanding for calculation of benefits.

After reviewing the decision of the Commissioner, a court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's decision, with or without a remand for a rehearing or further explanation.  When a court concludes that an ALJ's decision is not supported by substantial evidence, or fails to correctly apply relevant legal standards, reversal is appropriate, and remand for further proceedings may be the proper remedy.  *See, e.g.*, *Snell v. Apfel*, 177 F.3d 128, 133, 136 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)).  For example, in *Shaal*, 134 F.3d at 505, the Second

Circuit remanded for further proceedings for the following reasons:

> [B]ecause we are unsure exactly what legal standard the ALJ applied in
> weighing [the treating physician's] opinion, because application of the
> correct standard does not lead inexorably to a single conclusion, and
> because the Commissioner failed to provide plaintiff with "good reasons"
> for the lack of weight attributed to her treating physician's opinion as
> required by [Social Security Administration] regulations, we conclude that
> the proper course is to direct that this case be remanded . . . to allow the
> ALJ to reweigh the evidence pursuant to the 1991 Regulations, developing
> the record as may be needed.

More recently, in *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004), the Second Circuit

explained that, when "the administrative record contains gaps" and "further development

of the evidence is appropriate," courts generally remand the claim to the Commissioner

for further administrative proceedings.  In other words, when "further findings would so

plainly help to assure the proper disposition of [the] claim," remand for further

proceedings and a new decision is appropriate.  *Id.* (alteration in original) (internal

quotation marks omitted).

On the other hand, when the court finds "no apparent basis to conclude that a more

complete record might support the Commissioner's decision," *Rosa v. Callahan*, 168

F.3d 72, 83 (2d Cir. 1999), and "substantial evidence on the record as a whole indicates

that the Claimant is disabled and entitled to benefits," *Bush v. Shalala*, 94 F.3d 40, 46 (2d

Cir. 1996) (internal quotation marks omitted), courts have opted to remand solely for a

calculation of benefits.  *See, e.g.*, *Balsamo*, 142 F.3d at 82 (holding court may direct

Commissioner to award benefits only when record has been fully developed and

substantial evidence indicates claimant is entitled to benefits); *Carroll v. Sec'y of Health

and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983) ("[W]hen, as here, the reversal is

based solely on the [Commissioner's] failure to sustain his burden of adducing evidence of the claimant's capability of gainful employment and the [Commissioner's] finding that the claimant can . . . work is not supported by substantial evidence, no purpose would be served by our remanding the case for rehearing unless the [Commissioner] could offer additional evidence."); *Butts*, 388 F.3d at 385–86 ("[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.") (internal quotation marks omitted); *Lamar v. Barnhart*, 373 F. Supp. 2d 169, 177 (E.D.N.Y. 2005) ("[R]emand would serve no further purpose because the record here clearly demonstrates persuasive proof of the Plaintiff's disability, as numerous doctors' examinations diagnosed the Plaintiff's 'total disability' and inability to . . . perform simple daily tasks."); *Mackey v. Barnhart*, 306 F. Supp. 2d 337, 344 (E.D.N.Y. 2004) (remanding solely for calculation of benefits where two treating doctors, supported by significant additional medical evidence, found plaintiff's impairments totally disabling, and there was insufficient evidence to support Commissioner's rejection of their opinions).

In this case, remand for further proceedings would not be useful, as substantial evidence indicates that Wright is disabled; the record is complete; and there is no indication that other relevant evidence exists. Wright filed his DIB and SSI applications in November 2006, over eight years ago. (AR 136–46.) Since then, he has had three administrative hearings before two different ALJs, two Appeals Council orders remanding for further proceedings and a new decision, and one District Court order

remanding for further proceedings and a new decision. (AR 24–56, 949–1024.) Remanding for yet another proceeding and decision, particularly when the Commissioner has made no suggestion that she has new evidence which would support a decision denying disability, could delay payment of Wright's benefits for many more years. Although the length of time that a claim has been pending is not a sufficient basis to reverse and award benefits, *see Giddings v. Astrue*, 333 F. App'x 649, 655 (2d Cir. 2009)[7], here, substantial evidence indicates that Wright is disabled and entitled to benefits. As discussed above, the ALJ should have given significant weight to the opinions of Dr. Knapp and Ken Smith and little weight to the opinions of nonexamining consultant Dr. Farrell. Had he done so, Wright would have been found disabled, pursuant to VE testimony. Thus, considering "the often painfully slow process by which disability determinations are made," *Carroll*, 705 F.2d at 644, and that no purpose would be served by remanding for further proceedings, remand for calculation of benefits is the more appropriate remedy. *See Balsamo*, 142 F.3d at 82 (noting that claimant filed for disability benefits "more than four years ago").

## Conclusion

For these reasons, I recommend that Wright's motion (Doc. 7) be granted, and the Commissioner's motion (Doc. 13) be denied. Based on the evidence establishing that Wright suffers from physical and psychological impairments which render him incapable of working, the failure of the Commissioner to present evidence not yet considered which

---

[7] *See also Bush*, 94 F.3d at 46 ("absent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits").

demonstrate that Wright's impairments were not disabling during the relevant period, and the length of time the claim has already consumed, I further recommend that the ALJ's decision be reversed and the claim remanded solely for calculation of benefits.

Dated at Burlington, in the District of Vermont, this 20th day of March, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).